THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
MELVIN GUYON *et al.*, Defendants-Appellants.

First District (3rd Division) Nos. 81—0979, 81—1108 cons.

Opinion filed August 24, 1983.

James J. Doherty, Public Defender, and David J. Bradford, both of Chicago (Hugh Stevens, Assistant Public Defender, and Jenner & Block, of counsel), for appellants.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Kevin Sweeney, and Rhoda W. Davis, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McGILLICUDDY delivered the opinion of the court:

Following a jury trial, defendant, Melvin Guyon, was found guilty of aggravated kidnaping, rape and armed robbery of Josephina. His codefendant, Michael Guyon, was found guilty of aggravated kidnaping, rape, deviate sexual assault, and armed robbery of Josephina's sister, Alicia. Motions to sever their trials and to suppress information, filed by both defendants, had been heard and denied prior to

trial.

On appeal Melvin argues that (1) the trial court erred in refusing to allow him to introduce evidence of other crimes committed by Michael, as well as in denying the motion to sever the trials of the two brothers; (2) the trial court improperly restricted Melvin's closing argument as well as his cross-examination of one of the State's witnesses; (3) references to other crimes of Melvin were improper; (4) the prosecutor's improper arguments during closing argument denied Melvin a fair trial; and (5) the court abused its discretion in sentencing Melvin to extended terms of 45 years on each count, consecutive to his prior Federal sentence of life imprisonment.

Michael Guyon argues on appeal that (1) the State failed to prove his guilt beyond a reasonable doubt; (2) a new trial is necessary since the trial court erred in denying his motion *in limine* to prevent the introduction of his prior conviction for impeachment purposes; and (3) the prosecutor's improper comments and argument denied defendant a fair trial.

In the early morning hours of September 17, 1978, Josephina and Alicia were returning home from a discotheque where Josephina worked as a waitress. Alicia had been dancing at the discotheque since 8 or 9 p.m., and had had six or seven mixed drinks in the course of the evening. As they walked toward home at 6 a.m., a man approached them, pulled out a small gun and forced them into a car parked in an alley. Although Alicia testified that she was afraid to look at the man, both women identified this man from a photo array, a lineup and at trial, as Michael Guyon.

Michael traded places with Melvin, the driver of the car, who got into the back seat with Alicia and Josephina. Both women identified the second man from a photo array, a lineup and at trial as Melvin Guyon. He had a small knife which he kept pointed at Alicia. Alicia was crying with her head in Josephina's lap. Michael told her to "shut up."

They drove to a parking lot near 43d and Halsted streets. Michael took the knife from Melvin and told Alicia to climb over the seat and to take off her underclothes. After she did so, he ripped her skirt up the front. Alicia offered him $7 and her jewelry not to harm her. He took the money and then had forcible sexual intercourse with her. Alicia was crying and bleeding and Michael asked Melvin for some tissues for the blood.

Melvin ordered Josephina to undress and forced her to engage in sexual intercourse. He then took $5 or $6 from Josephina's wallet. The men allowed the women to dress and gave them each 30 cents

for bus fare. The men threatened to hurt them if they told anyone about the incident. The ordeal had lasted about 30 to 40 minutes, and Josephina testified it was still dark when they were released. Alicia testified that it was getting light.

The women took a bus to 35th and Halsted streets. Alicia was in a state of shock when the two went into a restaurant. Alicia entered the restroom and Josephina told two policemen who were in the restaurant that they had been raped.

Officer Lenore Flaherty of the Chicago police department came to the restaurant. She testified that Alicia was hysterical and told her only, "I was a virgin." Josephina told Officer Flaherty that they had been raped, and described the offenders and their car. The man in the front seat was described as black, 24 to 28 years old, black hair, brown eyes, approximately 190 pounds, black pants, brown sweat shirt with the sleeves cut off, black hairnet, and missing a bottom tooth. He said his name was "Jack." He had a small gun. Officer Flaherty did not remember being told that he had a mustache or a goatee, although Josephina remembered saying he had a mustache.

The man in the back seat was described as black, 20 to 24 years old, six feet tall, black hair, brown eyes, 180 pounds, black pants, black mesh shirt, black hairnet and crooked teeth. Josephina did not remember if she said he had hair on his chin.

The car was described as a late model, blue, with power windows, cloth seats and a box of yellow Puffs tissues in the back window. The back window had black lines on it. Officer Flaherty testified that Alicia told her there was blood on the front seat. At trial, Alicia did not remember that and denied it. Neither sister described a C.B., C.B. equipment, eight-track tapes, initials on the dashboard or a dent on the side of the car.

Officer Flaherty drove the women to Mercy Hospital where they were examined by a gynecologist, Dr. Jose Balboa. He testified that his examination of Alicia revealed a tear in the hymen with active bleeding. His examination of Josephina revealed no injury. His examination of slides from both women's vaginal areas did not show sperm. Other slides were delivered to the microanalysis unit of the Chicago Crime Laboratory along with Alicia's skirt and panties. Michael Ziefeldt, an employee of the laboratory, testified that he examined the slides and found sperm. Alicia's clothing revealed blood but not sperm. The clothing and slides were admitted into evidence.

On September 18, 1978, two investigators for the Chicago police department, Raymond Luth and Gerald Slattery, visited Alicia and Josephina and obtained a description of the offenders and their vehicle.

The women did not mention a mustache or a goatee or that the car had a C.B., eight-track tapes or initials on the dashboard. On September 20, 1978, the sisters viewed photographs in two to 10 books and identified no one. At trial Luth testified on cross-examination that Michael's picture could have been in one of those books.

On September 23, 1978, Alicia and Josephina viewed a lineup and a blue car but made no identification. Both identified a photograph of a blue car with license number TA 7142 and a box of yellow Kleenex in the back window as the car of their attackers.

On October 3, 1978, Michael Guyon was arrested for abducting a 4½-year-old girl. Over objection of counsel for Michael, the arresting officer was allowed to testify regarding the circumstances of the arrest as long as he did not use the word "abducted." The officer testified that when he arrested Michael Guyon with the 4½-year-old girl he was driving a blue car and wearing a black hairnet. A gun and shells were recovered from the floor of the front seat of the car. At trial, Josephina testified that the gun from the car looked like the one her assailant had used. A pocketknife taken from the car was also identified by Josephina.

The officer testified that when the car was impounded it had another knife, wires, a tape deck and tapes on the transmission hump. The parties agreed that evidence of the second knife could not be introduced at trial. A swab of unknown substance from the front passenger seat was submitted to a microanalyst for analysis. He found neither blood nor sperm.

Michael's wife, Donna Guyon, testified that their car was a 1977 Chevrolet with defroster lines on the back window. It had eight-track tapes, a tape player, a C.B. radio and red wires on the front window relating to the C.B. There were initials, M. D. Z., on the dashboard. On cross-examination, one of the prosecuting attorneys asked whether she had a four-year-old daughter in 1978. Counsel for Michael objected and the objection was sustained.

The arresting officer testified that Michael was wearing a black hairnet when arrested and placed in the police lockup.

On October 4, 1978, Alicia and Josephina viewed a lineup of five black men including Michael. They also viewed his car and the black hairnet taken from him when arrested. The sisters viewed the lineup separately and each identified Michael as the man who had initially accosted them and raped Alicia. Front and side views of the lineup were admitted into evidence.

Josephina testified she identified the car and the hairnet after the lineup. She identified People's exhibits Nos. 9 to 14, for identification,

as pictures of the car. She mistakenly identified pictures of the car she saw on September 23, 1978, as the same car she saw on October 4, 1978, and mistakenly testified that both cars were the same. She had made the same error at the pretrial hearing. She testified that the yellow tissue boxes in the rear windows of the two cars were the same.

Alicia identified People's exhibits. Nos. 9 to 11 and 14, for identification, as pictures of the car. She testified that the car was not the same car she had viewed on September 23, 1978; that both cars had yellow tissue boxes but that the boxes were different.

Alicia testified that she identified the hairnet and the car before viewing the lineup in which she identified Michael. Investigator Luth testified that he showed the sisters the hairnet and the car and that they identified both. However, none of the police reports mentioned the hairnet. Luth testified, in explanation, that there had been a multitude of reports concerning many things on October 4, 1978. Michael moved for a mistrial based on this remark. The motion was denied. The court also denied repeated requests by counsel for Melvin to question Luth regarding whether, following Michael's arrest, his wife, Donna, gave Luth information leading to Melvin's arrest.

On October 7, 1978, Luth contacted the Cleveland police department regarding Melvin. On October 14, 1978, Alicia and Josephina were shown separately eight black-and-white photos including one of Melvin taken on March 1, 1978. Prior to showing the photos, Luth covered all the writing on them with white paper. Both sisters identified Melvin in separate showings.

On October 16, 1978, Luth obtained warrants for Melvin's arrest. On October 18, 1978, Luth procured a warrant for Melvin for unlawful flight to avoid prosecution. On March 18, 1980, Luth and another investigator brought Melvin from Marion, Illinois. Both Alicia and Josephina identified him separately from a lineup with four other men.

Michael's and Melvin's indictments were consolidated on the motion of the State and over the objections of both defendants. Prior to trial, both defendants moved for a severance on the ground that Melvin intended to show that Michael and an unidentified party had committed rapes and kidnapings in the same area of the city and around the same period of time as the offenses against Alicia and Josephina. Melvin alleged that these other acts constituted a *modus operandi*, as well as tending to prove that he had been misidentified, and thus would be admissible as tending to prove Melvin's innocence, and, therefore, the defenses of Melvin and Michael were in conflict. Both defendants also moved to sever on the ground that they would

be prejudiced by their filial relationship. In response, the State made a motion *in limine* to preclude the use of evidence of other rapes involving Michael Guyon. Following a hearing, the court granted the State's motion *in limine* and denied defendants' motions.

During trial, the court allowed testimony, objected to by Michael, concerning the circumstances of his arrest including the discovery of a 4½-year-old girl in his car.

During trial Michael made a motion *in limine* to exclude admission of a long black kitchen knife, which had no relation to the case, that had been found in his car. Although the State agreed to the motion, at trial the prosecutor asked Michael's wife if she could identify the knife. She testified she had never seen it before, and it was not admitted into evidence. Nevertheless, during closing argument the prosecutor held the knife up to the jury and claimed that defendant had had it with him during the rapes for reinforcement. Defendant's objection was sustained.

During the State's closing argument the prosecutor referred to Melvin's presence in Marion, Illinois (the location of a Federal penitentiary), when arrested. The prosecutor also referred to the defendants as "jackals *** waiting for their prey," "barbarians," and "guards at the gates of hell." In addition, he stated: "It's not a responsibility to defend him, he carries with him the presumption of innocence, but that presumption is stripped from them [*sic*] when the case has been proven, and it has been proven. When you go back to the jury room that presumption of innocence is ripped off of them like any shroud that cowards hide behind." These remarks were objected to by defense counsel and, in most instances, the objections were sustained. Defendants' motions for mistrial on the basis of the improper remarks of the prosecutor were denied.

The jury entered verdicts of guilty on all counts and the court entered sentences on the verdicts. Melvin was sentenced to 45 years on each count, the sentences to be concurrent but consecutive to a prior sentence of life imprisonment. Michael was sentenced to 60 years on each count to run concurrently with his prior 60-year sentence. Defendants appeal.

## I

We first address the issues raised by defendant Melvin Guyon. Melvin argues that the trial court erred in granting the State's motion *in limine* precluding the introduction of evidence of other rapes committed by his codefendant, Michael, and an unidentified third party. It is Melvin's contention that his absence from these other of-

fenses tends to prove that he was not the perpetrator of the instant offenses. Thus, he contends he was denied his right to a defense.

■ Although it is within the discretion of the trial court to decide which evidence is admissible, and its decision should not be reversed unless such discretion has been clearly abused (*People v. Martinez* (1979), 76 Ill. App. 3d 658, 663, 395 N.E.2d 124), our supreme court held in *People v. Peter* (1973), 55 Ill. 2d 443, 459, 303 N.E.2d 398, cert. denied (1974), 417 U.S. 920, 41 L. Ed. 2d 225, 94 S. Ct. 2627, that any circumstances may be put into evidence which tend to make the proposition at issue more or less probable. In the instant cause the issue was whether Alicia and Josephina correctly identified Melvin as the man who raped Josephina. Both women positively and independently identified Melvin as the offender. We do not believe the fact that Melvin was not involved in other rapes in which his brother participated tends to make it less probable that it was Melvin who raped Josephina.

This situation is distinguishable from *People v. Outlaw* (1978), 67 Ill. App. 3d 327, 384 N.E.2d 898, where this court held that a defendant who was charged with aggravated battery and attempted murder of a police officer had been deprived of his right to a defense by the trial court's exclusion of the testimony of witnesses to the robbery of a shoe store immediately prior to the shooting, who would have testified that they were unable to identify the defendant as the robber, or as the person who shot the officer in his flight from the store. Because of the obvious connection between the robbery and the shooting in *Outlaw*, we held that "the exclusion of the testimony of the persons who witnessed the robbery was error." 67 Ill. App. 3d 327, 331.

In the case at bar there is no established connection between Michael's other crimes and the one committed with Melvin. At most the introduction of these other crimes could have created speculation in the minds of the jurors that someone else could have been with Michael when the sisters were attacked. Evidence of a speculative nature is of little probative value, and it is within the discretion of the trial court to exclude it. *People v. Logan* (1980), 87 Ill. App. 3d 351, 408 N.E.2d 1086; *People v. Mikel* (1979), 73 Ill. App. 3d 21, 391 N.E.2d 550.

Melvin argues in addition that he should have been allowed to introduce evidence of the other rapes committed by Michael and an unidentified third party, because they constituted a *modus operandi*. However, as the State points out, Michael's most recent conviction was for a rape he committed alone, thus no *modus operandi* has been established. (See *People v. Guyon* (1981), 101 Ill. App. 3d 799, 428

N.E.2d 998.) Therefore, we find that the trial court did not abuse its discretion in refusing to admit evidence of the other rapes committed by Michael.

## II

■ Melvin next contends that the court erred in refusing to order a severance of his trial from that of his brother. He argues that in separate trials he would have been allowed to introduce evidence of Michael's other crimes since there would have been no prejudice to his codefendant. In view of our finding that this evidence was of little probative value concerning the case against Melvin, as well as our finding that these other offenses did not establish a *modus operandi* as to Michael, this argument is without merit.

It is well established in Illinois that separate trials are required only where the defenses of the codefendant are so antagonistic that a fair trial cannot be assured without a severance. (*People v. Brooks* (1972), 51 Ill. 2d 156, 281 N.E.2d 326; *People v. Canaday* (1971), 49 Ill. 2d 416, 275 N.E.2d 356.) The decision as to whether separate trials should be granted is within the sound discretion of the trial court on the basis of the degree of antagonism between the defenses of those being jointly tried. *People v. Malaszenko* (1979), 76 Ill. App. 3d 1, 393 N.E.2d 1350.

A conclusory assertion that defenses are antagonistic is not sufficient to warrant a severance. (*People v. Davis* (1976), 43 Ill. App. 3d 603, 357 N.E.2d 96.) There must be a true conflict; such as where each defendant attributes an offense to the actions of the other (*People v. Clark* (1972), 50 Ill. 2d 292, 278 N.E.2d 782); where each defendant condemns the other and declares the other will testify to facts exculpatory to himself and incriminating to the other (*People v. Braune* (1936), 363 Ill. 551, 2 N.E.2d 839); where a codefendant's confession implicating defendant is received into evidence without instructions to the jury limiting its admissibility to the maker of the statement (*People v. Sweetin* (1927), 325 Ill. 245, 156 N.E. 354); or where each codefendant makes an admission or confession orally and the references to the codefendant applying for the severance are not eliminated from the testimony. *People v. Barbaro* (1946), 395 Ill. 264, 69 N.E.2d 692.

In the instant matter, Melvin claims that he was prejudiced through association because certain evidence was admitted tending to establish Michael's poor character, which Melvin was not allowed to develop since the trial court had ruled that Michael's other crimes were not admissible. Specifically, Melvin mentions that Michael was

originally identified from a group of mug shots which a witness for the State had testified were shown only to the victims of certain crimes, implying that Michael had been involved in other rapes. In addition, the arresting officer was allowed to testify that Michael had a 4½-year-old girl in the car with him when he was apprehended, although there was no testimony that the girl had been abducted. Finally, the State elicited testimony that there were "a multitude of reports on October 4, concerning a number of things." In our opinion these remarks are too ambiguous to have caused prejudice to Melvin. Certainly, they are not antagonistic as defined by case law and, thus, separate trials were not required.

Finally Melvin argues that a severance was necessary because Melvin had once been accused of molesting Michael's daughter. However, even though this may have caused Michael to feel hostile toward Melvin, defendant offers no concrete manifestations of antagonism resulting from this hostility. Mere apprehension of antagonism is not enough. (See *People v. Cart* (1981), 102 Ill. App. 3d 173, 429 N.E.2d 553, *cert. denied* (1982), 459 U.S. 942, 74 L. Ed. 2d 199, 103 S. Ct. 255.) Failure to show antagonism, combined with independent evidence linking a defendant to a crime negates the necessity of severance. (*People v. Malaszenko* (1979), 76 Ill. App. 3d 1, 393 N.E.2d 1350.) There was ample independent evidence linking Melvin to the instant offense. Melvin was unequivocally and independently identified by both women from mug shots, as well as from a lineup, and again in court. Thus, no severance was required.

### III

■ Melvin next argues that the court erred in restricting the cross-examination of Investigator Luth, since Luth's apprehension of Michael led to the arrest of Melvin. Melvin alleges that if cross-examination had not been restricted counsel would have been able to show that the critical information leading to Melvin's arrest was supplied by Michael's wife, Donna. He contends this would have supported his assertion that he was involved in this case solely because of his relationship with Michael. Thus, he argues, he was denied his right to a defense.

It is well established that a defendant is entitled in cross-examination to develop all circumstances within the knowledge of a witness which explain, qualify, discredit or destroy his direct testimony. (*People v. Strother* (1972), 53 Ill. 2d 95, 290 N.E.2d 201.) The scope and manner of cross-examination are within the discretion of the trial court. (*People v. Peter* (1973), 55 Ill. 2d 443, 303 N.E.2d 398, *cert. de-*

*nied* (1974), 417 U.S. 920, 41 L. Ed. 2d 225, 94 S. Ct. 2627; *People v. Halteman* (1956), 10 Ill. 2d 74, 139 N.E.2d 286.) Its decision in this regard will not be reversed absent a clear abuse of discretion resulting in manifest prejudice to defendant. *People v. Halteman.*

In the instant matter we do not believe the trial court's restrictions of the cross-examination of Investigator Luth could have been prejudicial to Melvin. Clearly, the decision of the court rested upon the belief that the possible prejudice to Michael resulting from any further discussion of the circumstances of his arrest was greater than the relevance of those circumstances to the identification of Melvin as Michael's accomplice.

This cause is readily distinguishable from *People v. Strother*. In *Strother*, the court had restricted cross-examination regarding whether the principal prosecution witness, a police informant, was addicted to narcotics. Noting that narcotics addicts are "notorious liars" and that their testimony is "subject to suspicion," the court stated:

> "It is our opinion that inasmuch as [the informant's] credibility was the crucial factor in the determinaton of this case, there being insufficient independent evidence in the record to establish defendant's guilt, the trial court's rejection of defense counsel's request to examine the informant's arm was an abuse of discretion and prejudicial error. [Citation.]" *People v. Strother* (1972), 53 Ill. 2d 95, 99.

The testimony of Investigator Luth regarding the circumstances of Michael's arrest was not "crucial evidence" in the action against Melvin. There was clearly sufficient independent evidence to establish Melvin's guilt. He was identified by both women on three separate occasions: from his photograph, in the lineup, and again in court. Both women had been with the defendant for over 30 minutes in the early morning hours when it was beginning to grow light. Where identification of a defendant is at issue, the testimony of only one witness is sufficient to convict if she has viewed defendant under circumstances allowing a positive identification. (*People v. Gonzales* (1978), 60 Ill. App. 3d 980, 377 N.E.2d 91; *People v. Davis* (1977), 53 Ill. App. 3d 424, 368 N.E.2d 721.) Therefore, it is our opinion that the trial court did not abuse its discretion in restricting the cross-examination of Luth.

■ Melvin contends that the trial court abused its discretion in restricting his closing argument. Defense counsel had attempted to argue that all of the physical evidence linking Melvin to the crime had been found in the possession of Michael. The State objected to this statement, and the objection was sustained. The character and scope

of closing argument are within the discretion of the trial court, and absent an abuse the trial court's ruling will not be reversed. *People v. Smothers* (1973), 55 Ill. 2d 172, 302 N.E.2d 324.

We believe that Melvin's argument was needlessly prejudicial to Michael. The same information could have been relayed to the jury simply by arguing that none of the physical evidence was found in Melvin's possession without any reference to Michael. Although a defendant has an absolute right to argue his cause in a criminal case, the exercise of that right is subject to the discretionary power of the trial judge to control, within reasonable limits, how that right shall be enjoyed. (*People v. Diaz* (1971), 1 Ill. App. 3d 988, 275 N.E.2d 210.) Thus, we see no error in this regard.

Furthermore, because of the strength of the independent evidence of defendant's guilt, contrary to defendant's assertion we do not believe that any violation of due process occurred.

## IV

■ Melvin next asserts that references to his "other crimes" were prejudicial, denying him a fair trial. He bases this argument (1) on the prosecutor's remark during trial that a warrant had been issued for Melvin for unlawful flight to avoid prosecution; (2) upon the fact that the police photograph from which he was identified had been allowed to go to the jury, and that two of the jurors were post office employees and the photograph had been displayed in the post office in connection with an F.B.I. manhunt; and (3) on the prosecutor's remark, "you don't find him (Melvin) in Marion, Illinois in a hairnet, if they allow that ***."

Regarding the mention of the warrant and the reference to Melvin's presence in Marion, it is well established that informing the jury of the consequential steps in the investigation of a crime is necessary and important to the full explanation of the State's case. (*People v. Byrd* (1976), 43 Ill. App. 3d 735, 357 N.E.2d 174.) Such facts are properly received into evidence. (*People v. Williams* (1977), 52 Ill. App. 3d 81, 367 N.E.2d 167.) Further, the remarks contained no details as to what criminal activities were involved, and were, in our opinion, too vague to have caused prejudice. See *People v. Stacker* (1979), 77 Ill. App. 3d 302, 395 N.E.2d 997.

■ As to the police photograph going to the jury, we first note that the printed information had been taped over and that the photographs were the ones Investigator Luth had shown to the two women and from which they had originally identified Michael and Melvin. In *People v. Byrd* the court stated that police photos are admissible to

show the reasonableness of a witness' identification. Since Melvin's identification was at issue, we believe the probative value of the photos far outweighed any possible prejudice to him. See also *People v. Morano* (1979), 69 Ill. App. 3d 580, 387 N.E.2d 816.

■ Regarding the possibility of prejudice where two jurors were employed at the post office during the period when Melvin's photograph was displayed there, we first point out that there was no objection to these jurors at *voir dire* although they informed the court of their employment. In addition, whether they recognized defendant is purely speculative. It has been held that jurors need not be ignorant of the extraneous facts of a case, as long as they are able to put aside their own impressions and base their verdict on the evidence presented at trial. (*People v. Logan* (1980), 87 Ill. App. 3d 351, 408 N.E.2d 1086.) In view of the overwhelming evidence of Melvin's guilt, we do not believe the jurors in the instant matter reached a verdict of guilty on the basis of outside knowledge.

## V

■ Melvin asserts that he was deprived of a fair trial by the prosecutor's comments during closing argument. In his brief on appeal he has organized these comments into seven groups. Without minimizing the importance of any comments during closing argument, for purposes of this opinion we will discuss only those which had the greatest potential for prejudicial effect on the jury.

First, Melvin correctly asserts that the prosecutor's remarks regarding the reasonable doubt standard were highly improper. The prosecutor stated:

> "Every defendant who has ever been convicted in this country, in this state, in this county, in this building, has been convicted beyond a reasonable doubt."

In *People v. Martinez* (1979), 76 Ill. App. 3d 280, 395 N.E.2d 86, we stated that a prosecutor's comment, that people throughout the United States were being found guilty beyond a reasonable doubt every day of the week, lessened the State's burden of proof by implying that reasonable doubt was merely a minor detail. Similarly, in the case at bar, we believe that the prosecutor's implication that the reasonable doubt standard was a mere formality or ritual tended to reduce reasonable doubt in the minds of the jury to an empty phrase.

Such behavior by the prosecutor cannot be tolerated. A prosecutor is expected to show respect and due regard for defendant's constitutionally protected right to a fair trial. *People v. Brown* (1983), 113 Ill. App. 3d 625, 447 N.E.2d 1011.

The prosecutor further stated:

"*** [H]e carries with him the presumption of innocence, but that presumption is stripped from them [*sic*] when the case has been proven, and it has been proven.

When you go back to the jury room that presumption of innocence is ripped off of them like any shroud that cowards hide behind."

It is a fundamental doctrine of our system of criminal justice that the law presumes a defendant to be innocent until he is proved guilty beyond a reasonable doubt. (*People v. Weinstein* (1966), 35 Ill. 2d 467, 220 N.E.2d 432.) This presumption is founded upon the "first principle of justice, and is intended, not to protect the guilty, but to prevent, so far as human agencies can, the conviction of an innocent person." (22A C.J.S. *Criminal Law* sec. 581, at 336 (1961).) We believe that the prosecutor's characterization of this presumption as a shield or refuge for the guilty demeans our criminal justice system. It is an affront to the law and cannot be tolerated by this court. The fact that defense counsel's objections to these remarks were not sustained further aggravates the situation.

In addition, during closing argument the prosecutor showed the jury a kitchen knife found in the car when Michael was arrested. This knife had no relationship to the case at bar. It had, in fact, been the subject of an agreed motion *in limine*. Nevertheless, the prosecutor represented to the jury that the knife had been brought along by defendants for "reinforcement" on the night of the rapes. It can be sufficient error to reverse a judgment if the prosecutor comments on matters not properly in evidence and pertinent to the issues in a case, even if defense counsel's objections are sustained. *People v. Weinger* (1981), 101 Ill. App. 3d 857, 428 N.E.2d 924; *People v. Connors* (1980), 82 Ill. App. 3d 312, 402 N.E.2d 773.

Further, the prosecutor argued to the jury that he would not have allowed any of the State's witnesses to testify falsely, stating:

"If they had misidentified anyone at anytime, as I stand here, you would have heard it from that stand.

\* \* \*

Mr. O'Brien and I would have had to have been willing to suborn perjury;

\* \* \*

My own integrity comes into play also ***."

Although a prosecutor may comment on the credibility of witnesses (*People v. Martinez* (1979), 76 Ill. App. 3d 280, 395 N.E.2d 86), he may not inject his personal opinion of defendant's guilt. (*People v.*

*Monroe* (1977), 66 Ill. 2d 317, 362 N.E.2d 295.) This is improper and prejudicial final argument. *People v. Bitakis* (1972), 8 Ill. App. 3d 103, 289 N.E.2d 256.

Based on these instances alone, there can be no doubt that the State's closing argument exceeded the bounds of propriety and jeopardized defendant's right to an impartial trial. In addition we are aware that courts are examining improper prosecutorial argument with vigorous and growing concern. See *People v. Clark* (1983), 114 Ill. App. 3d 252, 448 N.E.2d 926; *People v. Brown* (1983), 113 Ill. App. 3d 625, 447 N.E.2d 1011; *People v. Starks* (1983), 116 Ill. App. 3d 384.

In determining whether a prosecutor's closing comments are prejudicial, reference must be made to the content of the language used, its relation to the evidence and the effect of the argument on the rights of the accused to a fair and impartial trial. (*People v. Franklin* (1976), 42 Ill. App. 3d 408, 355 N.E.2d 634.) Error caused by the prosecutor's closing argument does not become reversible error unless there is substantial prejudice to the accused. (*People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200; *People v. Nilsson* (1970), 44 Ill. 2d 244, 255 N.E.2d 432, *cert. denied* (1970), 398 U.S. 954, 26 L. Ed. 2d 296, 90 S. Ct. 1881.) Thus, despite the indefensible behavior of the assistant State's Attorney, we are constrained to hold that under the circumstances present in the instant matter, Melvin's conviction should not be reversed on this ground. As in the *Baptist* case, we are faced with overwhelming evidence of guilt. Melvin was positively identified by the unimpeached testimony of two eyewitnesses, under circumstances establishing the credibility of that identification. It is clear that the evidence of guilt is so strong that the improper arguments were harmless error beyond a reasonable doubt. See *People v. Warmack* (1980), 83 Ill. 2d 112, 413 N.E.2d 1254; *People v. Shepard* (1983), 114 Ill. App. 3d 598, 449 N.E.2d 222; *People v. Battles* (1981), 93 Ill. App. 3d 1093, 418 N.E.2d 22.

## VI

■ Melvin contends that the trial court erred in sentencing him to an extended term of 45 years for aggravated kidnaping, since aggravated kidnaping is a Class 1 felony for which an offender may be sentenced to no more than 30 years even under an extended term. (Ill. Rev. Stat. 1979, ch. 38, pars. 10—2, 1005—8—1(a), 1005—8—2(a).) The State concedes that this argument is correct.

In addition, section 5—8—2(a) of the Unified Code of Corrections provides:

"A judge shall not sentence an offender to a term of imprisonment in excess of the maximum sentence authorized by Section 5—8—1 for the class of the most serious offense for which the offender was convicted unless the factors in aggravation set forth in paragraph (b) of Section 5—5—3.2 were found to be present." (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—2(a).)

In *People v. Evans* (1981), 87 Ill. 2d 77, 429 N.E.2d 520, our supreme court established that under the statute cited above an offender can only receive an extended sentence for the most serious class of offenses for which he has been convicted. The most serious offenses for which Melvin was convicted were rape and armed robbery, both Class X offenses. Therefore, his extended sentence for aggravated kidnaping must be vacated and this case must be remanded for resentencing in regard to that offense. See *People v. Freeman* (1982), 104 Ill. App. 3d 980, 433 N.E.2d 974.

 Melvin next argues that the court erred in imposing an extended sentence for rape, because that offense allegedly was not accompanied by brutal or heinous behavior indicative of wanton cruelty as is required for the imposition of extended sentence by sections 5—8—2 and 5—5—3.2(b) of the Unified Code of Corrections. However, we find that the defendant's conduct was both brutal and heinous, indicative of wanton cruelty: two young women were abducted by strangers at gun point and held prisoner in an automobile under the additional threat of a knife; they were both brutally raped and forced to witness the rapes of each other; one was left bleeding with her clothing torn; they were robbed of everything but bus fare. In our opinion this indicates wanton cruelty. Thus, extended sentences were warranted.

 Melvin further contends that the court erred in imposing sentences consecutive to his term of Federal imprisonment for the murder of an F.B.I. agent. The Unified Code of Corrections provides:

"When multiple sentences of imprisonment are imposed on a defendant at the same time, or when a term of imprisonment is imposed on a defendant who is already subject to *** or for a sentence imposed by any district court of the United States, the sentences shall run concurrently or consecutively as determined by the court." (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—4(a).)

Paragraph (b) of the same statute provides that the court may impose consecutive sentences when it believes that such a term is necessary to protect the public from further criminal activity by the defendant. The basis for this must be set forth in the record. In the instant matter the court stated:

"*** I've heard many rape cases and there are rape cases and there are rape cases. I feel this is heinous and repulsive. At least in the material I heard.

I feel an extended term is necessary in this case. I think a long sentence is necessary for one thing, due to the type of crimes we have here, plus it's necessary to deter others in the community from committing the same types of crimes in the same manner. I think the public demands it and it has a right to demand firm action in a case of this kind."

From this statement it is obvious that the court believed consecutive sentences were necessary to protect the public as authorized by the statute. Accordingly, we find no error in this regard.

██ Melvin's final contention is that his sentence was unfairly disparate to that of his codefendant. However, at the time of his arrest Melvin was serving a sentence for the murder of an F.B.I. agent. Thus, we agree with the State that it is absurd to suggest that his criminal history was superior to that of his brother who had a history of rapes, attempted batteries, murder, and aggravated kidnaping. In our opinion the murder of a member of a law enforcement agency in the performance of his duty is one of the most odious transgressions possible. Thus, the trial court did not abuse its discretion in sentencing Melvin.

VII

We now address the issues raised by Michael Guyon on appeal. Michael first asserts that he was not proved guilty beyond a reasonable doubt. However, as we have stated previously, the clear and convincing testimony of only one eyewitness is enough to sustain a conviction if she has viewed the accused under circumstances permitting a positive identification. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.) Michael was independently identified by the unimpeached testimony of both Alicia and Josephina in a photo display, from a lineup and again in court. For reasons we have delineated earlier the sisters viewed the accused under circumstances permitting a positive identification.

Michael points out certain discrepancies between the sisters' original description of Alicia's rapist and Michael's appearance at trial. As an example, the attacker had been described as 24 to 28 years old. Michael was 36 years old at that time. There were also certain discrepancies involving weight and facial hair. However, we first note that over two years had passed by the time Michael was brought to

540

trial. Further, this court has previously stated:

> "The failure of the victim, within a matter of a few hours of traumatic sexual assaults, to recall infallibly and relate to the police every detail, description and observation does not render her later recollection of a more complete version of the events implausible. Because of the nature of the assaults and the lack of sleep, discrepancies which exist between her original statements to the authorities and her trial testimony are understandable. Such differences as exist between the two versions go only to the weight given the testimony by the triers of fact. [Citation.]" (*People v. Utinans* (1977), 55 Ill. App. 3d 306, 314-15, 370 N.E.2d 1080.)

Although courts of review have a duty to review the evidence, we are neither required nor permitted to substitute our judgment regarding the weight or credibility of the evidence for that of the jury. In rape cases a jury verdict will not be reversed unless it is so unreasonable and contrary to the manifest weight of the evidence as to raise a reasonable doubt of defendant's guilt. (*People v. Reese* (1973), 54 Ill. 2d 51, 294 N.E.2d 288; *People v. Utinans*.) Our review of the record raises no such doubt. On the contrary, we find the testimony to be both consistent and believable. Nor do we believe errors in the women's description of the defendant's car or his gun to be significant. Again, they were matters for the jury to evaluate in reaching their determination. (*People v. Guyon* (1981), 101 Ill. App. 3d 799, 428 N.E.2d 998.) In our opinion Michael was proved guilty beyond a reasonable doubt.

## VIII

 Michael next contends that the trial court erred in ruling that the State would be allowed to impeach him with evidence of a prior rape conviction if he testified. He asserts that this prevented him from testifying in his own behalf, thus denying him a fair trial and depriving him of a defense. The Illinois rule regarding the admissibility of prior convictions for impeachment was established in *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695. In *Montgomery*, the supreme court adopted Rule 609 of the Committee on Rules of Practice and Procedure of the Judicial Conference of the United States which provides that, for purposes of attacking the credibility of a witness, evidence that he has been convicted of a crime is admissible if the crime was punishable by death or imprisonment of more than one year and the accused was convicted of such crime within the last 10 years, unless the judge determines that the probative value of

the evidence of the crime is substantially outweighed by the danger of unfair prejudice. See *People v. Hovanec* (1979), 76 Ill. App. 3d 401, 394 N.E.2d 1340.

Thus, Michael's conviction for rape in 1980 was admissible for impeachment purposes since it was a Class X felony punishable by imprisonment for more than one year (Ill. Rev. Stat. 1979, ch. 38, par. 11—1; Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—3), unless the trial judge determined that its probative value was substantially outweighed by the danger of unfair prejudice. Defendant asserts that the trial court failed to perform this balancing test. We disagree. In the case at bar, the record reveals that the admissibility of Michael's previous rape conviction was argued thoroughly before the court, including a discussion of the *Montgomery* case. The court concluded that the conviction was probative and would be helpful to the jury in determining Michael's credibility. Where, as here, it appears in the record that the court is clearly aware of *Montgomery*, "[I]t must be assumed that the judge gave appropriate consideration to the relevant factors and they need not appear of record. [Citation.]" (*People v. Hovanec* (1979), 76 Ill. App. 3d 401, 421, 394 N.E.2d 1340; see *People v. Johnson* (1982), 104 Ill. App. 3d 572, 432 N.E.2d 1232.) According to *Montgomery* this rule should not be applied rigidly, but flexibly on a case by case basis to allow the trial court to exercise its discretion. *People v. Johnson.*

A defendant's decision not to testify is a question of trial strategy. (*People v. Hovanec* (1979), 76 Ill. App. 3d 401, 394 N.E.2d 1340.) He may not defeat the discretion of the trial court simply by deciding in retrospect that the decision was a poor one, when the trial court's ruling has been legally correct. (*People v. Johnson; People v. Ganter* (1977), 56 Ill. App. 3d 316, 371 N.E.2d 1072.) Thus, we find Michael's argument in this regard to be without merit.

IX

Michael next contends that he was deprived of a fair trial by the prosecutor's erroneous comments and arguments during trial and in closing argument. As in the case of his codefendant, Melvin, the prosecutor's remarks regarding reasonable doubt, the presumption of innocence and the prosecutor's own integrity were unquestionably improper and certainly would have jeopardized the right of any defendant to a fair trial. However, again similarly to Melvin, Michael's guilt was established by overwhelming evidence. Prosecutorial error does not become reversible error unless there is substantial prejudice to the accused. (*People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d

1200; *People v. Nilsson* (1970), 44 Ill. 2d 244, 255 N.E.2d 432, *cert. denied* (1970), 398 U.S. 954, 26 L. Ed. 2d 296, 90 S. Ct. 1881.) In the instant case there was overwhelming evidence of the guilt of Michael. As in the case against Melvin, Michael was positively identified by the unimpeached testimony of two eyewitnesses. The credibility of that identification was clearly established. Therefore the improper arguments were harmless error beyond a reasonable doubt. *People v. Warmack* (1980), 83 Ill. 2d 112, 413 N.E.2d 1254.

## X

Finally, Michael argues that the prosecutor improperly referred to other crimes he had allegedly committed, thereby causing him serious prejudice. However, our review of the record establishes that the references to other crimes allegedly committed by Michael were made principally in connection with his original apprehension, in the course of a police search for a missing child. It is well established that informing the jury of the consequential steps in the investigation of a crime is necessary to the full explanation of the State's case. (*People v. Williams* (1977), 52 Ill. App. 3d 81, 367 N.E.2d 167; *People v. Byrd* (1976), 43 Ill. App. 3d 735, 357 N.E.2d 174.) It is a necessary adjunct to the State's case in explaining why defendant was arrested. (*People v. Harper* (1981), 94 Ill. App. 3d 298, 418 N.E.2d 894; *People v. Byrd.*) Furthermore, since the prosecutor did not go into the details of any other offense, we find his remarks too ambiguous to have caused substantial prejudice. See *People v. Stacker* (1979), 77 Ill. App. 3d 302, 395 N.E.2d 997.

Regarding the testimony elicited from the police investigator regarding reports on Michael concerning other offenses, defense counsel's objections were sustained and the questions were stricken. The jury was properly instructed to disregard testimony which had been stricken. We believe this was sufficient to cure any harm to the accused. *People v. Lindsay* (1978), 67 Ill. App. 3d 638, 384 N.E.2d 793.

Accordingly, this case is affirmed except as to the sentencing of Melvin Guyon for aggravated kidnaping. It is remanded for proper sentencing as to that offense.

Affirmed in part; remanded in part.

McNAMARA, P.J., and WHITE, J., concur.